FILED
ENTERED
RECEIVED
SERVED ON
COUNSEL/PARTIES OF RECORD

JAN - 6 2010

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY:                          DEPUTY

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ANNETTE HALL, | 3:08-CV-00632-RCJ-VPC |
| Plaintiff, | |
| v. | **ORDER** |
| RALEY'S, | |
| Defendant. | |

Plaintiff Annette Hall filed the present lawsuit against Defendant Raley's alleging sexual harassment, retaliation, and negligent supervision and retention. Presently before the Court is Defendant Raley's Motion for Summary Judgment (#15). Plaintiff Hall filed an opposition (#18) and Defendant Raley's filed a reply (#21). The Court heard oral argument on December 11, 2009. The Court now issues the following order. IT IS HEREBY ORDERED that Defendant Raley's Motion for Summary Judgment (#15) is GRANTED.

## I. BACKGROUND

This matter arises out of allegations of sexual harassment, retaliation, and negligent supervision and retention by Defendant Raley's, ("Defendant").

**A. General Background**

Plaintiff Annette Hall, ("Plaintiff"), began working for Defendant in March 1989. (Hall Depo., Def.'s Mot. for Summ. J. (#15) Hilden Decl. Ex. 1 at 9:18–20). She worked as a

1

1   grocery merchandiser. (*Id.* at 10:1–9). Her job required her to regularly work at different

2   stores. (*Id.* at 26:3–7). From November 2007 to June 2008, she worked at approximately 10

3   different Raley's stores. (*Id.* at 26:8–11). Plaintiff's manager was Susan Arbuckle. Plaintiff

4   would speak to her from one to three times a day. (*Id.* at 10:7–11:5).

5       In 2003, Plaintiff received a Raley's Employee Handbook. (*Id.* at 19:9–20:20). The

6   handbook contains a three-step procedure for employees to deal with harassment. First, the

7   employee should tell the harasser to stop. Second, if the harassment does not stop after step

8   one or if the employee is uncomfortable confronting the harasser, the employee should tell his

9   manager. Third, if the harassment continues, the employee should contact the Senior Director

10  of Human Resources. If the behavior is egregious, the employee should contact the Senior

11  Director of Human Resources immediately. If the employee is dissatisfied with the above

12  procedure, he may submit a written complaint to Raley's president. (Raley's Employee

13  Handbook, Def.'s Mot. for Summ. J. (#15) Hilden Decl. Ex. 3 at 13–14).

14    **B. Harassment by Mills**

15       Plaintiff first encountered Travis Mills when she worked at Defendant's Mount Rose

16  store in November 2007. (Hall Depo., Def.'s Mot. for Summ. J. (#15) Hilden Decl. Ex. 1 at 21,

17  26). Mills worked as a utility clerk. His duties included sweeping the floor, taking out the

18  garbage, and cleaning the restrooms. (*Id.* at 21–22). Plaintiff worked at the Mount Rose store

19  a total of 38.5 days before she was suspended in June 2008.[1] (Hall Stmt., Def.'s Mot. for

20  Summ. J. (#15) Hilden Decl. Ex. 5 at 1, 2, 4, 13, 15, 16, 17, 18).

21       Plaintiff noticed that Mills "didn't comprehend very well" and got the impression that he

22  was "mentally challenged." (Hall Depo., Def.'s Mot. for Summ. J. (#15) Hilden Decl. Ex. 1 at

23  22–23). She noticed that Mills acted "strangely" by attempting to get customers' attention,

24  offering to do things for them, and repeatedly saying "hi, my name is Travis. Can I help you

25  find anything? If you need any help, come and get me and I'll help you." (*Id.* at 23–24). He

26

27        [1] Defendant calculates the total as 37. (*See* Def.'s Mot. for Summ. J. (#15) 17:3–14).

28  Defendant ignores April 1, 2008, (Hall Stmt., Def.'s Mot. for Summ. J. (#15) Hilden Decl. Ex.
5 at 15), and a half day worked in early March 2008, (*Id.*).

would also act strangely with other employees.  He would not leave them alone, ask them questions, ask them if he could help them, and repeat himself many times.  He did this to "[p]retty much the whole store.[2]  (*Id.* at 25–26).  Mills was a "big guy" and about six feet tall.  (*Id.* at 49:24–50:11).

Plaintiff believes Mills sexually harassed her by: calling her "Antoinette," "Angelina," "Angela," or other names because he could not remember her name; following her into the restroom; cornering her in the backroom and the utility room; trying to converse with her while she was working in the aisles; trying to get her attention; staring at her; walking by the aisles while she was working; asking her what she was doing; telling her other people could clean so she did not have to; offering to do things for her; following her; bagging her groceries for her; and asking her why she did not like him.  (*Id.* at 29:22–31:16).  Plaintiff testified that Mills followed her to the bathroom because on several occasions, he would knock on the bathroom door and yell "maintenance" while she was in the stall.  She would yell "I'm in here" and Mills would wait outside until she exited before going in.  (*Id.* at 32–33).  She was not the only woman in the bathroom at the time.  (*Id.* at 33–34).  Plaintiff testified that Mills cornered her in the utility room by standing in her way and asking her why she did not like him.  (*Id.* at 34–35).  She told him she did not like him and to leave her alone, then pushed her cart towards him as he backed away to let her get out.  (*Id.* at 35–36, 44–45).  Other employees observed this.  (*Id.*).

Plaintiff felt that Mills actions were sexual because of the way he stared and jeered.  Mills' behavior scared her.  (*Id.* at 43:16–21, 48:24).  But she never characterized his actions as sexual when complaining to others and never called it sexual harassment.  (*Id.* at 43:11–13, 86:9–12).  She often referred to Mills as a "kid" and said he followed her around like a "puppy dog."  (*Id.* at 48:6–13, 30:23–25).

---

[2] Plaintiff asserts that Mills would get angry and bang his head against the wall and go into uncontrollable rages so that his father would have to be called.  (Hall Depo., Pl.'s Opp'n (#18) Ex. 1 at 111:20–112:4, 112:11–113:4, 115:2–12).  This appears to be inadmissible hearsay that should not be considered on summary judgment.  *See* Fed. R. Civ. P. 56(e); *In re Sunset Bay Assocs.*, 944 F.2d 1503, 1514 (9th Cir. 1991).  Plaintiff did not witness any of this.

### C. Plaintiff's complaints about Mills

In December 2007, Plaintiff first complained about Mills to Grocery Manager Tom Trigero. (*Id.* at 40:9–41:3). Plaintiff told Trigero that Mills was stalking her, following her, and harassing her. (*Id.* at 41:4–8). She told him Mills was "driving [her] crazy," "[would not] stay away from [her]," "call[ed] [her] a different name" every time he walked by, "was getting on [her] nerves," was "irritating," and was "annoying."[3] (*Id.* at 42:13–20). Plaintiff asked Trigero to talk to Mills and tell him to leave her alone. (*Id.* at 43:2–6). Trigero laughed and told her that Mills was "not all there" and that he "doesn't remember" things.[4] (*Id.* at 41:4–8, 42:21–43:1). Plaintiff did not tell Trigero that Mills was sexually harassing her or that Mills behavior was sexual. (*Id.* at 43:7–44:1). In addition, Plaintiff testified that Trigero routinely witnessed Mills' harassing behavior. (*Id.* at 41:9–18).

In January 2008, Plaintiff again complained to Trigero about Mills after Mills cornered her in the utility room. (Hall Stmt., Def.'s Mot. for Summ. J. (#15) Hilden Decl. Ex. 5 at 7). She told Trigero that Mills was annoying her, bugging her, bothering her, calling her the wrong name, and asking her why she did not like him. (Hall Depo., Def.'s Mot. for Summ. J. (#15) Hilden Decl. Ex. 1 at 50–51). Even though she felt sexually harassed, she did not tell Trigero that Mills was sexually harassing her because she did not want to get Mills in trouble. (*Id.* at 46:19–22, 47:23–48:25). She did tell Trigero that Mills was "scaring and threatening" her. (*Id.* at 49:10–17). Trigero told her that Mills takes medication and might be out right now and to yell at Mills to get him to leave her alone. (*Id.* at 46:5–18). Plaintiff said she did not have to yell at Mills and that Trigero needed to tell Mills to stay away from her. (*Id.*). Trigero said he already told Mills once and Plaintiff responded that he needed to do so again because Mills was not staying away from her. (*Id.*).

In May 2008, Plaintiff again complained to Trigero after Mills followed her to the

---

[3] Plaintiff alleges that she also told Trigero that Mills was following her to the restroom at this point, but Plaintiff fails to point to any evidence supporting this. (Pl.'s Opp'n (#18) 2:23–27).

[4] Plaintiff alleges that Trigero also told her that Mills had a "crush" on her, but fails to point to any evidence supporting this. (Pl.'s Opp'n (#18) 3:2–4).

bathroom. (Hall Stmt., Def.'s Mot. for Summ. J. (#15) Hilden Decl. Ex. 5 at 18). Trigero "didn't think anything about it." (*Id.*). Plaintiff felt that Trigero "acted appropriately in response" to her complaints about Mills. (Hall Depo., Def.'s Mot. for Summ. J. (#15) Hilden Decl. Ex. 1 at 130). After this, in April and May, Plaintiff did not work in the Mt. Rose store that much and Mills "seemed to back off and not harass [her] so much in the aisles." (*Id.* at 127:2–21). In addition to these specific complaints to Trigero, Plaintiff testified that she told Trigero that Mills looked at her like he wanted to undress her and that Mills scared her several times. (*Id.* at 117:16–21). Plaintiff testified that she complained to Trigero every time she worked in the store with Mills from December 2007 through March 2008. (*Id.* at 119:12–126:23).

Plaintiff also complained about Mills to her supervisor, Arbuckle, during a meeting. (Hall Stmt., Def.'s Mot. for Summ. J. (#15) Hilden Decl. Ex. 5 at 15). She told Arbuckle that Mills followed her, stared at her, and was annoying. (Hall Depo., Def.'s Mot. for Summ. J. (#15) Hilden Decl. Ex. 1 at 55–56). Another employee also complained about Mills repeatedly asking her name, asking what she was doing, and following her. (*Id.* at 56–57). Arbuckle mentioned that she knew who they were talking about because Mills had done the same things to her. (*Id.* at 55–56). Plaintiff did not tell Arbuckle that Mills was sexually harassing her or that she wished to pursue any action against Mills. (*Id.* at 55:13–16, 57:6–9).

Plaintiff also complained to Natural Foods Manager Terry Rua, Head Clerks Linda Daniels and Eric Jensen, and Manager of Grocery Mike Pertio. (*Id.* at 39:1–40:8). Plaintiff did not complain about Mills to Store Director Shawn Williams, the highest-level manager at the Mt. Rose store. (*Id.* at 26:15–28:18, 40:9–13). Nor did Plaintiff complaint to the second-highest level manager, the Assistant Store Director. (*Id.* at 40:9–13). Plaintiff never complained to anyone in Human Resources about Mills' behavior, even though she had complained to Human Resources twice in the past about employees talking about her. (*Id.* at 51:6–52:3, 98:1–18, 11:15–14:18). Plaintiff met with Human Resources Manager Nancy Hammers in January 2008 regarding a car accident and did not mention any problems with Mills. (*Id.* at 15–18:11).

/

5

### D. Plaintiff Drags Mills by his ear

On June 3, 2008, Plaintiff grabbed Mills by his ear and walked with him before Mills was able to remove her hand. The exact details on this incident are in dispute. Plaintiff testified that she was in the backroom when Mills "ran up . . . right behind [her]" and was "on [her] back . . . almost touching [her]." (*Id.* at 64–65). She testified that Mills started talking about an ice spill and "just wouldn't back off." (*Id.*). However, a video recording of the incident only shows Plaintiff walking towards Mills, grabbing his ear, and walking for about three steps before Mills grabbed her hand and removed it. (*Id.* at 69:16–72:17, 79:21–80:15). Plaintiff admitted her conduct was inappropriate and that she should not have touched Mills. (*Id.* at 80:16–22).

Mills complained to Store Director Williams. (Def.'s Mot. for Summ. J. (#15) Hammers Decl. ¶ 5, Ex. A). Tirgero then asked Plaintiff to fill out a report on the incident. (Hall Depo., Def.'s Mot. for Summ. J. (#15) Hilden Decl. Ex. 1 at 67:1–11). In her report, Plaintiff stated that Mills had followed her to the bathroom earlier that day and laughed at her when she exited. (*Id.* at 67:24–68:2). However, a video recording showed the following: Plaintiff entered the women's restroom; Mills stood outside the restrooms, putting on gloves to clean; Mills entered the men's restroom; a female customer entered the women's restroom; Mills pushed open the door to the women's restroom but did not go in; Mills waited outside the restroom; the female customer exited the women's restroom; Plaintiff exited the women's restroom; Mills laughed. (*Id.* at 73–76). It is disputed whether Mills was laughing at Plaintiff or was laughing with another employee. (*Id.* at 76:19–77:7).

In the report, Plaintiff also stated that she told Mills there was ice on the floor later in the day. Mills said there was no ice. Plaintiff said there was and grabbed Mills' ear to show him. Mills grabbed her finger and twisted it to get away. Plaintiff then told Mills to clean up the ice and leave her alone. She threatened to go to Human Resources about him. Mills then cleaned up the ice and started talking to Plaintiff again. She told him again to leave her alone. (Hall Report, Def.'s Mot. for Summ. J. (#15) Hilden Decl. Ex. 6). Her report did not mention sexual harassment, threatening conduct, or prior complaints about Mills. (*Id.*)

6

/

**E. Plaintiff's suspension and termination**

Human Resources Manager Hammers interviewed Mills and Plaintiff the next day. (Hall Depo., Def.'s Mot. for Summ. J. (#15) Hilden Decl. Ex. 1 at 68; Def.'s Mot. for Summ. J. (#15) Hammers Decl. ¶¶ 7–10, Ex. D). Plaintiff told Hammers that Mills was following her and harassing her by calling her different names, trying to talk to her, and asking why she did not like him, which annoyed and bugged her. (Hall Depo., Def.'s Mot. for Summ. J. (#15) Hilden Decl. Ex. 1 at 68:17–69:13). She told Hammers that she had complained about Mills to Trigero "several times." (*Id.* at 118:8–23). Plaintiff did not say that Mills had been sexually harassing her or report any sexual conduct. (*Id.* at 68:12–20; Def.'s Mot. for Summ. J. (#15) Hammers Decl. ¶ 8).

Hammers told Plaintiff she would investigate the matter, but that Plaintiff was suspended at that time. (Hall Stmt., Def.'s Mot. for Summ. J. (#15) Hilden Decl. Ex. 5 at 33). Hammers obtained video recordings of the ear grabbing incident and the bathroom incident and talked to other employees about Mills. (Def.'s Mot. for Summ. J. (#15) Hammers Decl. ¶¶ 13–23). Hammers reported her findings to Raley's Corporate Human Resources Director Chris Clark. (*Id.* at ¶¶ 16, 26). After reviewing the video recordings and speaking with Hammers, Clark decided that Raley's should terminate Plaintiff for inappropriate conduct. (*Id.*; Def.'s Mot. for Summ. J. (#15) Clark Decl. ¶¶ 5–8;10–11).

Plaintiff alleges that Hammers fired her on June 11, 2008. (Hall Depo., Def.'s Mot. for Summ. J. (#15) Hilden Decl. Ex.1 at 87:19–25, 90:18–24). That same day, Hammers contacted Plaintiff to ask for a copy of the statement she had written about Mills' harassment. (*Id.* at 90–91). Plaintiff refused, saying she was unable to bring the statement at that time. (*Id.*). Hammers also asked Plaintiff to attend a meeting with Hammers and a district director the next day on June 12. (*Id.*). Hammers told Plaintiff she could not bring her lawyer, so Plaintiff refused to attend. (*Id.* at 91:2–14).

On June 12, 2008, Hammers received a letter from Plaintiff's attorney alleging that Plaintiff had been sexually harassed by Mills and retaliated against for complaining about it.

1  (Def.'s Mot. for Summ. J. (#15) Hammers Decl. ¶ 28, Ex. N). This was the first time Hammers
2  was made aware of any sexual harassment allegations. (*Id.* at ¶ 29).

3      On June 13, 2008, Hammers sent Plaintiff a letter informing her that Raley's had
4  decided to terminate her employment immediately for misconduct. (*Id.* at ¶ 30, Ex. O).

5      **F. Plaintiff's written statement**

6      After her suspension, between June 4 and 11, 2008, Plaintiff wrote a 34-page
7  statement describing her harassment by Mills. (Hall Depo., Def.'s Mot. for Summ. J. (#15)
8  Hilden Decl. Ex. 1 at 37, Ex. 5). Defendant alleges that the statement does not describe any
9  sexual or threatening conduct by Mills. (Def.'s Mot. for Summ. J. (#15) at 6:9–19). Though
10 Plaintiff never explicitly describes sexual harassment or threatening conduct and refers to
11 Mills as a "kid," (Hall Depo., Def.'s Mot. for Summ. J. (#15) Hall Stmt. Ex. 5 at 6, 24), her
12 statement does allege that Mills "stock[ed] [sic]" her, (*id.* at 4), acted aggressively, (*id.* at 6),
13 was infatuated with her, (*id.* at 6, 16, 32), and targeted her because she was a woman who
14 would not bully him like a man would, (*id.* at 28). In her statement, Plaintiff alleges that she
15 "gently" grabbed Mills earlobe "as a mother would to lead a little kid to a mess." (*Id.* at 24).

16

17                              **II. LEGAL STANDARD**

18     Summary judgment "should be rendered if the pleadings, the discovery and
19 disclosure materials on file, and any affidavits show that there is no genuine issue as to
20 any material fact and that the movant is entitled to judgment as a matter of law." Fed. R.
21 Civ. P. 56(c)(2). The moving party bears the burden of demonstrating the absence of a
22 genuine issue of material fact and the material lodged by the moving party must be viewed
23 in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S.
24 144, 157 (1970). "'[A] material issue of fact is one that affects the outcome of the litigation
25 and requires a trial to resolve the differing versions of the truth.'" *Lynn v. Sheet Metal
26 Workers' Int'l Ass'n*, 804 F.2d 1472, 1483 (9th Cir. 1986) (quoting *Admiralty Fund v. Hugh
27 Johnson & Co.*, 677 F.2d 1301, 1306 (9th Cir. 1982)). "[T]here is no issue for trial unless
28 there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for

1  that party. If the evidence is merely colorable, or is not significantly probative, summary

2  judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)

3  (citations omitted). "A mere scintilla of evidence will not do, for a jury is permitted to draw

4  only those inferences of which the evidence is reasonably susceptible; it may not resort to

5  speculation." *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978); *see*

6  *also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993) ("[I]n the

7  event the trial court concludes that the scintilla of evidence presented supporting a

8  position is insufficient to allow a reasonable juror to conclude that the position more likely

9  than not is true, the court remains free . . . to grant summary judgment."). Moreover, "[i]f

10  the factual context makes the non-moving party's claim of a disputed fact implausible, then

11  that party must come forward with more persuasive evidence than otherwise would be

12  necessary to show there is a genuine issue for trial." *Blue Ridge Ins. Co. v. Stanewich*,

13  142 F.3d 1145, 1147 (9th Cir. 1998) (citing *Cal. Architectural Bldg. Products, Inc. v.*

14  *Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987)). Conclusory allegations

15  that are unsupported by factual data cannot defeat a motion for summary judgment. *Taylor*

16  *v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

17

18  ## III. ANALYSIS

19  **A.    Defendant is entitled to judgment as a matter of law on Plaintiff's sexual**

20  **harassment claim because there is no genuine issue of fact as to**

21  **whether Mills' behavior was severe enough to alter her conditions of**

22  **employment.**

23  It is unlawful for an employer "to limit, segregate, or classify his employees . . . in

24  any way which would deprive or tend to deprive any individual of employment opportunities

25  or otherwise adversely affect his status as an employee, because of such individual's . . .

26  sex . . . ." 42 U.S.C. § 2000e-2(a)(2). "Sexual harassment is a form of sex discrimination.

27  By tolerating sexual harassment against its employees, the employer is deemed to have

28  adversely changed the terms of their employment in violation of Title VII." *Swenson v.*

1 | *Potter*, 271 F.3d 1184, 1191 (9th Cir. 2001).

2 |   To establish a claim for hostile work environment, Plaintiff must show: (1) that she

3 | was subjected to verbal or physical conduct of a harassing nature because of her sex, (2)

4 | the conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive

5 | to alter the conditions of Plaintiff's employment and create an abusive working

6 | environment. *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995).

7 |   Whether the workplace is objectively hostile must be determined from the

8 | perspective of a reasonable person with the same fundamental characteristics as the

9 | plaintiff, and must be measured based on the totality of the circumstances. *Fuller v. City of*

10 | *Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995). "'Simple teasing,' offhand comments, and

11 | isolated incidents (unless extremely serious) will not amount to discriminatory changes in

12 | the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775,

13 | 788 (1998) (citations omitted). Similarly, the mere utterance of an offensive epithet is not,

14 | by itself, actionable under Title VII. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67

15 | (1986). However, persistent subjection to racial or sexual derogation can alter the

16 | conditions of employment. *Woods v. Graphic Commc'ns*, 925 F.2d 1195, 1202 (9th Cir.

17 | 1991).

18 |   In evaluating the objective hostility of a work environment, the factors to be

19 | considered include: (1) the frequency of the discriminatory conduct; (2) its severity; (3)

20 | whether it is physically threatening or humiliating, or a mere offensive utterance; and (4)

21 | whether it unreasonably interferes with an employee's work performance. *McGinest v.*

22 | *GTE Service Corp.*, 360 F.3d 1103, 1113 (9th Cir. 2004). The work environment must both

23 | subjectively and objectively be perceived as abusive. *Burrell v. Star Nursery, Inc.*, 170

24 | F.3d 951, 954 (9th Cir. 1999); *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir.

25 | 1995).

26 |   Mills' conduct was not sufficiently severe to alter the conditions of Plaintiff's

27 | employment. The alleged discriminatory conduct did not occur frequently. From

28 | November 2007 to June 3, 2008, Plaintiff only worked with Mills 38.5 days. During the

months of April and May, Mills did not bother her much.  Objectively, Mills conduct is merely annoying.  Because of Mills' mental deficiencies, he had trouble remembering people's names and reading social cues.  He appears to have been overly friendly, not noticing when he got on other's nerves. This conduct was not severe.  None of Mills' conduct appears to have been humiliating.  Plaintiff felt threatened when she perceived Mills to be cornering her and following her to the restroom.  But when Mills cornered her, Plaintiff was in view of other employees.  Plaintiff was not alone when Mills followed her to the restroom and Mills did not follow her inside, but waited outside for her to leave before entering to clean.  Mills made no explicit threats and never touched or harmed Plaintiff. Plaintiff did not seem threatened by Mills when she grabbed his ear and began to drag him to the ice spill.  Mills' questioning annoyed Plaintiff and interfered with her work performance, but not unreasonably so.  Plaintiff worked in the aisles.  She could not expect to be completely isolated from questioning and human interaction.  Furthermore, Plaintiff was able to perform her work for approximately six months while this went on.

In an attempt to show that Mills behavior was sufficiently severe to sustain a sexual harassment claim, Plaintiff cites several cases where stalking was held to be sexual harassment.  All the cited cases describe behavior much more severe than Mills' or are otherwise not on point.  In *Estevez v. Faculty Club of University of Washington*, the court did not address the question of whether gift giving and stalking was sufficiently severe because it found that the employee's behavior could not be imputed to the employer-defendant. 120 P.3d 579, 588–89 (Wash. Ct. App. 2005).  In *Hernandez-Payero v. Puerto Rico*, the harasser, beyond just workplace stalking, had grabbed the plaintiff's genitals, stared at her while grabbing himself and licking his pen, implied she had sexually transmitted diseases, and stalked her at her residence. 493 F. Supp. 2d 215, 219–20 (D. Puerto Rico 2007).  In *Crowley v. L.L. Bean, Inc.*, the harasser grabbed and massaged the plaintiff's feet, called her a perfect woman with perfect feet, gave her gifts to show that he was watching her outside of work, followed her at work, followed her home, waited by the bathroom while she was in it, blocked her in the aisles, and broke into her house and

11

1   grabbed her. 303. F.3d 387, 397–98 (1st Cir. 2002). In *Savino v. C.P. Hall Co.*, the

2   harasser called the plaintiff at home, stared at her and stalked her at work and outside of

3   work, blocked her at the office, asked her out to lunch and dinner, focused specifically on

4   the plaintiff, tried to put coffee packets down her shirt, made references to inserting a dick

5   and oral sex, touched her legs, gave her neck rubs, read Playboy magazine around her,

6   said she had a nice ass, and talked about sucking Mount Nips. 988 F. Supp. 1171, 1175,

7   1187 (N.D. III. 1997). Mills behavior is nowhere near as severe as the harassment in the

8   above cases. No reasonable jury would find that Mills' behavior was severe or pervasive

9   enough to alter the conditions of Plaintiff's employment. Therefore, Defendant is entitled

10  to judgment as a matter of law on Plaintiffs sexual harassment claim.[5]

11  **B.     Defendant is entitled to judgment as a matter of law on Plaintiff's**

12  **retaliation claim because it had a legitimate reason for terminating her**

13  **employment.**

14  To make out a prima facie case of retaliation under Title VII, Plaintiff must

15  demonstrate that: "(1) she engaged in a protected activity, (2) she suffered an adverse

16  employment action, and (3) there was a causal link between her activity and the

17  employment decision." *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065–66 (9th Cir.

18  2003) (quoting *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1196–97

19  (9th Cir. 2003)). If a prima facie case of retaliation is established and the employer

20  articulates some legitimate non-retaliatory reason for the challenged action, the plaintiff

21  "must demonstrate a genuine issue of material fact as to whether the reason advanced by

22  the employer was a pretext." *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir.

23  2000). The plaintiff can demonstrate a genuine issue of pretext either directly by showing

24  a discriminatory motive more likely motivated the employer or indirectly by showing the

25

26      [5] Defendant also argues that it is entitled to judgment as a matter of law on Plaintiff's
    sexual harassment claim because Plaintiff was not harassed because of sex, Defendant did
27  not know of the sexual harassment, and, if Defendant did know, it responded appropriately.
    Because the Court finds that there is no genuine issue of fact that Mills behavior was not
28  sufficiently severe or pervasive to alter Hall's conditions of employment, the Court does not
    address Defendant's other arguments.

1   employer's explanation is not credible. *Lindahl v. Air France*, 930 F.2d 1434, 1438 (9th
2   Cir. 1991).

3          Even if Plaintiff makes a prima facie case of retaliation against Defendant,
4   Defendant can provide a legitimate reason for her termination and Plaintiff cannot create a
5   genuine issue of material fact as to whether the reason was a pretext. Defendant
6   terminated Plaintiff because she grabbed Mills by the ear and dragged him a few steps
7   across the floor. Defendant had overwhelming evidence of this: Mills' statement, Plaintiff's
8   statement, and a video recording of the incident. Such physical abuse of an employee is a
9   legitimate grounds for termination. Defendant has a policy against physical harassment of
10  employees. (Def.'s Mot. for Summ. J. (#15) Hammers Decl. ¶ 16). Plaintiff admitted her
11  conduct was inappropriate.

12         Plaintiff claims other employees have behaved similarly and not been disciplined.
13  She refers to incidents where Russ McBroome got Mills so mad that Mills banged his own
14  head against the wall, (Hall Depo., Def.'s Mot. for Summ. J. (#15) Hilden Decl. Ex. 1 at
15  111:20–112:4), and where Eric Jensen grabbed Mills and shook him, (*Id.* at
16  110:21–111:19). Plaintiff claims these employees were not terminated for their behavior.
17  First, Plaintiff's testimony about these incidents is hearsay and should not be considered.
18  Second, Mills did not complain to Human Resources about any other incident of an
19  employee touching him besides the one involving Plaintiff. (Def.'s Mot. for Summ. J. (#15)
20  Hammers Decl. ¶ 31). Third, Defendant has terminated employees for less egregious
21  behavior, such as for grabbing an employee by the shirt. (*Id.* at ¶ 32). Fourth, Plaintiff's
22  behavior was more egregious than simply getting Mills mad so he would hurt himself or
23  grabbing his shoulders. Finally, even if other employees were treated differently,
24  Defendant's reason for firing Plaintiff appears perfectly reasonable and not pretextual.
25  Plaintiff was not fired until shortly after she pulled Mills' ear in June 2008 even though she
26  had been complaining about Mills since December 2007. Therefore, there is no genuine
27  issue of material fact as to whether Defendant terminated Plaintiff in retaliation for sexual
28  harassment complaints and Defendant is entitled to judgment on Plaintiff's retaliation claim

13

as a matter of law.

/

    **C.**    **Defendant is entitled to judgment as a matter of law on Plaintiff's**
               **negligent supervision and retention claim because employers are only**
               **liable for negligent supervision and retention for threats of physical**
               **harm.**

      A proprietor owes a duty to use reasonable care to keep his premises in a reasonably safe condition. *Hall v. SSF, Inc.*, 930 P.2d 94, 99 (Nev. 1996). Similarly, an employer has a duty to use reasonable care in the supervision and retention of employees "to make sure that the employees are fit for their positions." *Id.* "When the cause of action is for negligent supervision, as opposed to respondeat superior, it does not matter if the employee's actions occurred within or without his scope of employment." *Rockwell v. Sun Harbor Budget Suites*, 925 P.2d 1175, 1181 n.5 (Nev. 1996).

      Defendant contends that it cannot be liable because it only had a duty to avoid physical harm through its supervision and retention of employees. Defendant relies on a case that discusses the economic loss doctrine. *See Calloway v. City of Reno*, 993 P.2d 1259, 1263–64 (Nev. 2000), *overruled*, *Olson v. Richard*, 89 P.3d 31 (Nev. 2004). The economic loss doctrine was developed in product liability cases and states that there can be no recovery for purely economic losses in tort. *Calloway*, 993 P.2d at 1263–64. Nevada has recognized tort recovery for non-physical harm. *See, e.g., State, University and Community College Sys. v. Sutton*, 103 P.3d 8, 19 (Nev. 2004) (plaintiff can recover for "for all of the natural and probable consequences of the wrong, including injury to the feelings from humiliation, indignity and disgrace to the person" in tort action for breach of implied covenant of good faith and fair dealing). Plaintiff alleges damages for emotional distress, loss of enjoyment of life, and humiliation in addition to economic damages like lost wages. (Compl. (#1) ¶ 48).

      Some jurisdictions have limited claims for negligent hiring, retention, and supervision to situations involving the threat of physical injury. *See Perkins v. Spivey*, 911

1  F.2d 22, 30 (8th Cir. 1990) ("A cause of action does exist under Kansas common law when
2  employers negligently hire or retain employees they know or should know are incompetent
3  or dangerous when another employee is physically injured by the dangerous employee or
4  is emotionally harmed such that immediate physical injury is the result."); *Jernigan v.*
5  *Alderwoods Group, Inc.*, 489 F. Supp. 2d 1180, 1204 (D. Or. 2007) ("Because neither
6  Jernigan nor Haller provided evidence that she suffered physical injury as a result of
7  sexual harassment by Baker, Alderwoods' motion for summary judgment on plaintiffs' claim
8  for negligent supervision and retention should be granted."); *Leidig v. Honeywell*, 850 F.
9  Supp. 796, 807–08 (D. Minn. 1994) ("Although Minnesota courts have never directly
10 addressed this issue, the case law strongly suggests that this duty not to retain employees
11 with 'known dangerous proclivities' is limited to circumstances involving a threat of physical
12 injury."). Others have not limited claims for negligent hiring, retention, and supervision to
13 situations involving the threat of physical injury. *Daisley v. Riggs Bank, N.A.*, 372 F. Supp.
14 2d 61, 80–81 (D.D.C. 2005) (noting that jurisdictions are split on whether negligent hiring
15 and supervision requires physical harm and predicting it does not in D.C.); *Verhelst v.*
16 *Michael D's Restaurant San Antonio, Inc.*, 154 F. Supp. 2d 959, 968 (W.D. Tex. 2001) ("[A]
17 cause of action for negligent supervision and training requires that the employee in
18 question commit an actionable tort, causing a 'legally compensable injury'—not necessarily
19 a physical injury.").

20          Threats of physical harm may exist in sexual harassment cases, *see Leidig*, 850 F.
21 Supp. at 807 n.13, but they do not in this case. Plaintiff provided no evidence that Mills
22 was ever physically violent towards anyone. He never touched her until she was
23 physically violent towards him. She does not allege any physical harm. Therefore, the
24 Court must predict how the Nevada courts will rule on this novel question of Nevada law.
25 Given that "one who insults or annoys another, thereby causing a third person to suffer
26 fright or physical discomfort, is ordinarily not subject to liability to the third person unless
27 bodily harm results," Restatement (2d) of Torts: Compensatory Damages for Nonpecuniary
28 Harm § 905 cmt. c (1979), the Court predicts that physical harm is necessary for a

1  negligent retention and supervision claim in Nevada.  *See also id.* at § 313 cmt. a ("In

2  general . . . there is no liability where the actor's negligent conduct inflicts only emotional

3  distress, without resulting bodily harm or any other invasion of the other's interests."); *id.* at

4  § 436A ("If the actor's conduct is negligent as creating an unreasonable risk of causing

5  either bodily harm or emotional disturbance to another, and it results in such emotional

6  disturbance alone, without bodily harm or other compensable damage, the actor is not

7  liable for such emotional disturbance.").  Therefore, Defendant is entitled to judgment as a

8  matter of law on Plaintiff's negligent supervision and retention claim.[6]

9

10                                        **IV. CONCLUSION**

11           Accordingly, IT IS ORDERED that Defendant's Motion for Summary Judgment (#15)

12  is GRANTED.  The Clerk of the Court shall enter judgment accordingly.

13                              *6th*   JANUARY  2010
14           DATED: This ~~16th~~ day of ~~December, 2009~~

15

16                                        _____
17                                        Robert C. Jones
18                                        UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25  _____

26       [6] Defendant also argues that it is entitled to judgment as a matter of law on Plaintiff's
    negligent supervision and retention claim because Plaintiff did not consider Mills' actions
27  threatening, Plaintiff cannot show Defendant was negligent, and negligent supervision and
    retention does not apply to harms to an employee by a co-worker.  Because the Court
28  concludes that there can be no claim for negligent supervision and retention for threats of
    non-physical harms, the Court does not address Defendant's other arguments.